**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

RAFAEL ISMAEL NIETO-VINCENTY, *et al.*,

    **Plaintiffs,**

        **v.**

RONALD JOSE VALLEDOR, *et al.*,

    **Defendants.**

**Civil No.** 12-1585 (FAB)

**MEMORANDUM AND ORDER**

BESOSA, District Judge

    Before the Court are three motions for summary judgment:  one filed by Jose A. Valledor, Concepcion Valledor, and their conjugal partnership (Docket No. 75); a second filed by those same defendants, as well as Zurqui, Inc. d/b/a Sea Watch Divers ("Zurqui"), and Ronald Jose Valledor (Docket No. 80); and a third filed by Palmas del Mar Yacht Club and Marina ("PDMYC") (Docket No. 81.)  Also pending is a motion to strike.  (Docket No. 95.) After considering all relevant motions and replies, the Court now **GRANTS** the motions for summary judgment at Docket Numbers 75 and 81, **GRANTS IN PART and DENIES IN PART** the motion for summary judgment at Docket Number 80, and **DENIES** the motion to strike at Docket Number 95.

## I.   Summary Judgment Standard

Summary judgment serves to assess the evidence and determine if there is a genuine need for trial.  Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it has the potential to "affect the outcome of the suit under the governing law."  Id.  A dispute is "genuine" when it "could be resolved in favor of either party."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  It must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion.  Id. (citing Fed. R. Civ. P. 56(c)).  Once a properly supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).

It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "[A] party opposing summary judgment[, therefore,] must 'present definite, competent evidence to rebut the motion.'" Maldonado-Denis, 23 F.3d at 581 (internal citation omitted).  In making this assessment, the Court must take the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 779-80 (1st Cir. 2011).

## II.  Zurqui, Inc.'s and the Valledor Defendants' Motion for Summary Judgment

Defendants Zurqui, Inc. d/b/a Sea Watch Divers ("Zurqui, Inc."), Ronald Jose Valledor, Jose A. Valledor, Concepcion Valledor, and the conjugal partnership between Jose and Concepcion Valledor (collectively, "the Valledor defendants") move for summary judgment on three different grounds.  (Docket No. 80.)  After addressing defendants' motion to strike plaintiffs' expert witness (Docket No. 95), the Court will address each ground for summary judgment in turn.

### A.  Motion to Strike Plaintiffs' Expert Witness

Pursuant to deadlines agreed upon by the parties, plaintiffs' written answers to discovery were due on August 30, 2013, their expert reports on September 3, 2013, and their expert names and curricula vitae on September 6, 2013; discovery closed on

February 7, 2014.  (Docket No. 95.)  On August 30, 2013, plaintiffs provided defendants with a preliminary report by an expert witness with whom they had consulted, Commander John Deck III.  (Docket Nos. 103-1 & 103-2.)  On April 21, 2014, plaintiffs submitted a supplemental report by Commander Deck as an attachment to their opposing statement of material facts.  (Docket No. 87-15.)  That same day, Zurqui, Inc. and the Valledor defendants moved to strike Commander Deck's unsworn declaration and supplemental report, and to preclude the designation of Commander Deck as an expert witness. (Docket No. 95.)  Defendants contend that, despite their allowing plaintiffs multiple extensions of time to comply with discovery obligations and deadlines, plaintiffs failed to designate their expert witness and submit a supplemental expert report before the mutually agreed upon deadline.  Id.

Federal Rule of Civil Procedure 37 provides for the exclusion of tardy expert witness disclosures "unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  Plaintiffs do not offer any justification for their failure to comply fully with their supplemental discovery and disclosure deadlines, and the Court sympathizes with defendants' frustration.  Nevertheless, the Court finds that plaintiffs' tardiness was harmless.  Defendants had knowledge of plaintiffs' expert's identity and the substance of his preliminary report on August 30, 2013. (Docket Nos. 103-1 & 103-2.)  Additionally,

defendants assure that they did not "throw caution to the wind and simply assume that [p]laintiffs had not designated an expert witness," but rather retained two expert witnesses of their own. (Docket No. 95 at ¶ 15.)  Their suspicion that plaintiffs would eventually designate Captain Deck takes the wind out of the sails of defendants' prejudice argument and indicates that defendants could have similarly arranged to depose him prior to the close of discovery.   Accordingly, defendants' motion to strike (Docket No. 95) is **DENIED.**  The Court declines to reopen discovery; any future non-compliance on behalf of either party, particularly the plaintiffs, however, will result in sanctions.

   **B.   Uncontested Facts**

     On July 24, 2011, the M/V Sea Watch ("Sea Watch"), a seagoing diesel-propelled vessel, sank approximately 3.4 miles off the coast of Humacao, Puerto Rico.  (Docket No. 82-1 at ¶ 9.)  At that time, twenty-three persons were on board the vessel, including twenty-one plaintiffs as passengers, Ronald Valledor at the helm, and crew-member Edwin Sanchez.[1]  (Docket No. 82-1 at ¶ 7.)  All passengers on board the vessel were rescued.  (Docket No. 1 at ¶ 54.)  Plaintiff Alicia Vincenty-Medina, the wife of co-plaintiff and passenger Camillo Cangani, was not a passenger aboard the Sea Watch.  (Docket Nos. 1 at ¶ 37; 82-2 at pp. 16-17.)

---

   [1] Sanchez is not a party to this lawsuit.

A few days before July 24, 2011, plaintiff Rafael Ismael Nieto-Vincenty ("Nieto-Vincenty") contacted Ronald Valledor to discuss the possibility of transporting a group of friends and family members, including several children, from the Palmas del Mar marina to Vieques.  (Docket Nos. 82-1 at ¶ 4; 1 at ¶ 33.)   On July 23, 2011, plaintiff Nieto-Vincenty and his wife, plaintiff Zelma Charlotte Chiesa-Fuxench, met with Ronald Valledor and paid him $100.00.[2]  (Docket Nos. 87-3 at p. 2; 94-1 at ¶ 8.)   The twenty-one passengers arrived at Palmas del Mar Yacht Club and Marina ("PDMYC") on the morning of July 24, 2011.  (Docket No. 82-1 at ¶ 6.)  The Sea Watch had a total seating capacity for twenty-two persons, not including the helmsman's seat. (Docket No. 82-3 at p. 2.)

From the beginning of the voyage, smoke came from the vessel; the crew informed the passengers that the smoke was a normal occurrence, and the trip continued.  (Docket Nos.87-3 & 87-6 at pp. 12-13.)   Approximately midway through the voyage, the Sea Watch began to take on water below deck.  (Docket Nos. 87-2; 87-3; 87-5 at pp. 25-26.)   Ronald Valledor — assisted by Sanchez — was operating the Sea Watch at the time of its sinking.  (Docket No. 87

----

[2] The parties dispute whether this meeting took place at the Palmas del Mar marina (Docket No. 87-3 at p.2), or inside the Sea Watch (Docket No. 94-1 at ¶ 7).  They also dispute whether the $100.00 payment was a cash deposit for the trip (Docket No. 87-3 at p. 2), or a contribution for diesel and refreshments (Docket No. 94-1 at ¶ 8).

at p. 10.)  The United States Coast Guard subsequently conducted a search and rescue operation and investigation, but could not definitively determine the cause of the vessel's flooding and sinking.  (Docket Nos. 87-9; 87-11 at ¶ 5.)

On July 25, 2011, Ronald Valledor and others dove in the location where the Sea Watch had sunk in order to recover some of the passengers's personal belongings; they inspected and photographed the vessel, and discovered that the hull had been perforated.  (Docket Nos. 82-1 at ¶ 10-11; 87-10.)

### C.   Defendants' Arguments

#### 1.   The Warranty of Seaworthiness

Zurqui, Inc. and the Valledor defendants claim that because plaintiffs were not "seamen" pursuant to admiralty law, they were not entitled to a warranty of seaworthiness, or any protection derived from that warranty, from defendants.  Defendants contend that plaintiffs' first cause of action is tantamount to a warranty of seaworthiness claim, under which the vessel and her owner are liable for the injuries suffered by a "seaman" caused by the unseaworthiness of the ship.  See The Osceola, 189 U.S. 158 (1903) (superseded in part by statute 46 U.S.C. § 30104, as stated in Atlantic Sounding Co. v. Townsend, 557 U.S. 404 (2009)).  "The duty of seaworthiness is absolute and independent of negligence . . . ."  1 Thomas Schoenbaum, Admiralty & Maritime Law § 6-25 (5th ed. 2012).  This duty is owed to "a narrow class of maritime

workers — those who can claim 'seaman' status under the law.  Other persons who come aboard a vessel, such as passengers and visitors, are not seamen and cannot claim the benefit of the warranty."  Id. at § 6-27.  See also Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629 (1959) (noting that because the plaintiff was not a seaman, but rather a visitor on the vessel, he could not raise an unseaworthiness claim).  Although shipowners owe the duty of seaworthiness only to seamen, they also owe the duty of reasonable care to non-crew members who are legally aboard the vessel.  Kermarec, 358 U.S. at 630.

        Plaintiffs concede that they were not, and are not, "seamen" within the meaning of the Jones Act, 46 U.S.C. § 30104, and governing maritime law.  Plaintiffs' first cause of action, however, includes and emphasizes a claim that defendants breached their duty of reasonable care towards plaintiffs.  (Docket No. 1 at ¶ 60.)  Defendants' surreply allows as much; they simply reiterate that the claim of unseaworthiness is unavailable to plaintiffs, without contesting the validity of the negligence claim.  (Docket No. 93 at p. 2.)  Because the Court reads plaintiffs' first cause of action as a negligence claim, defendants' motion for summary judgment based on the inapplicability of the warranty of seaworthiness is **DENIED.**

### 2.   Alicia Vincenty-Medina's Claim for Negligent Infliction of Emotional Distress

Defendants contend that because plaintiff Alicia Vincenty-Medina was not in the "zone of danger" when the Sea Watch sank, she cannot recover for negligent infliction of emotion distress pursuant to maritime law.  Plaintiffs do not dispute that Alicia Vincenty was not in the "zone of danger" at the time of the incident in question — she was at her home in Trujillo Alto. (Docket Nos. 1 at p. 4; 82-2 at p. 16.)  Rather, plaintiffs argue that recovery for emotional distress is permissible pursuant to the "zone of danger," "relative bystander," and "physical impact" tests.  Plaintiffs contend that Alicia Vincenty's claim survives summary judgment because (1) Alicia Vincenty's husband was placed in danger, (2) Alicia Vincenty suffered emotional distress upon learning of this danger, and 3) this emotional distress was reasonably foreseeable to defendants.

While the First Circuit Court of Appeals has recognized that boating accidents are maritime torts within the admiralty and maritime jurisdiction of the federal courts, Medina v. Perez, 733 F.2d 170, 171 (1st Cir. 1984), the court of appeals has not decided whether a cause of action for negligent infliction of emotional distress lies in admiralty.  See Fairest-Knight v. Marine World Distrib., Inc., 652 F.3d 94, 102 n.7 (1st Cir. 2011) (noting that the First Circuit Court of Appeals has not definitively addressed the issue and declining to do so in that

case) (internal citations omitted).  Relying on the Supreme Court's

Federal Employers' Liability Act ("FELA") jurisprudence, however,

other federal appeals courts and this Court have recognized a cause

of action for negligent infliction of emotional distress in

admiralty.  Chan v. Soc'y. Expeditions, Inc., 39 F.3d 1398 (9th

Cir. 1994) (citing Consol. Rail Corp. v. Gottshall, 512 U.S. 532,

550 (1994)); Peemoller Sultan v. Pleasure Craft Contender 25, 139

F. Supp. 2d 230, 235 (D.P.R. 2001)(Fuste, J.) (compiling cases).

While the Ninth Circuit Court of Appeals declined to decide which

theory of liability would apply to admiralty claims of negligent

infliction of emotional distress, that court noted that none of the

theories would allow for recovery when the plaintiff was not

present at the accident scene.  Chan, 39 F.3d at 1409-10.  Other

federal courts have followed the Supreme Court's decision in

Gottshall and applied the "zone of danger" test.  See, e.g.,

Peemoller, 139 F. Supp. 2d at 235 (adopting the "zone of danger"

test for claims of negligent infliction of emotional distress);

Williams v. Carnival Cruise Lines, Inc., 907 F. Supp. 403, 406

(S.D. Fla. 1995) (same); Yballa v. Sea-Land Servs., Inc., 919 F.

Supp. 1428, 1435-36 (D. Haw. 1995)(same).

          Plaintiffs, citing Gottshall, argue that the

"relative bystander" and "physical impact" tests also apply to a

negligent infliction of emotional distress claim.  (Docket No. 87

at p. 8.)  This argument is unavailing.[3]  <u>Gottshall</u> held that the "relative bystander" test was inappropriate in the FELA context, and determined that the "zone of danger" test was most consistent with the goals of the federal statute.  <u>Id.</u> at 556.  The Supreme Court noted that even in the jurisdictions that apply the "relative bystander" test, it "limits recovery to persons who witness the severe injury or death of a close family member."  <u>Id.</u>

The Court, persuaded by the reasoning of Judge Fuste in <u>Peemoller</u>, holds that the "zone of danger" test governs admiralty claims for negligent infliction of emotional distress. The "zone of danger" test, however, limits recovery for emotional injury to "those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."  <u>Gottshall</u>, 512 U.S. at 548.  Because plaintiffs do not even allege — much less put forth evidence — that Alicia Vincenty was "placed in immediate risk of physical harm" by defendants' conduct in operating the Sea Watch, her claim for negligent infliction of emotional distress fails.  Accordingly, defendants' motion for summary judgment of this claim is **GRANTED**.  All claims brought by plaintiff Alicia

---

[3] Even if the other two tests cited by plaintiffs were applicable here, plaintiffs have not identified facts to support Alicia Vincenty's claim for intentional infliction of emotional distress under either theory.

Vincenty against Zurqui, Inc. and the Valledor defendants are **DISMISSED WITH PREJUDICE.**

   3.   **Plaintiffs' Maritime Tort Claim**

          Lastly, defendants argue that plaintiffs have not produced sufficient evidence to support their maritime tort claim. (Docket No. 80 at p. 6.)  To make out a maritime negligence claim, a plaintiff must establish the following elements:  (1) a duty required by law; (2) breach of that duty; (3) proximate cause; and (4) damages.  Schoenbaum, supra, at § 5-2.  Specifically, defendants argue that because plaintiffs failed to retain an expert witness on time, they cannot put forth evidence to of breach and causation.  The success of this argument is moored to defendants' motion to strike, discussed above.  See supra Part II.A.  Having denied defendants' motion to strike, the Court may consider both plaintiffs' and defendants' expert witness reports. The competing expert opinions create genuine factual issues as to the breach and causation elements of plaintiffs' maritime tort claim. Specifically, plaintiffs' expert, Commander Deck, opines that defendants breached their duty of care by transporting more than six passengers on the Sea Watch, and that this overloading caused the Sea Watch to sink.  (Docket No. 87-15.)  Defendants' expert witness, Captain Paul Simpson, opined that the Sea Watch was not overloaded and that she sank as a result of a breach in her hull, which was in turn caused by striking an unknown obstruction — a

superseding, intervening cause. (Docket No. 82-3.)  Because there remain genuine factual issues for each element of plaintiffs' tort claim, defendants' motion for summary judgment on a maritime tort claim ground is **DENIED.**

## III. The Valledor Matrimony's Motion for Partial Summary Judgment

Defendants Jose A. Valledor, Concepcion Valledor, and their conjugal partnership (collectively "the Valledor matrimony") move for partial summary judgment. (Docket No. 75.)  Plaintiffs base their claims against the Valledor matrimony on the theory that Jose Valledor is the true and lawful owner of the Sea Watch, while Zurqui, Inc. — the record owner of the vessel — was merely Jose Valledor's *alter ego*. (Docket No. 1 at ¶¶ 21-22.)  The Valledor matrimony now moves for partial summary judgment in Jose Valledor's personal capacity, contending that plaintiffs have failed to establish any genuine disputes of material fact regarding the corporate identity of Zurqui, Inc. (Docket Nos. 75 & 77.)  Because plaintiffs did not oppose the Valledor matrimony's motion for partial summary judgment, the tide runs strongly against their

claim.[4]  "When a non-moving party fails to file a timely opposition to an adversary's motion for summary judgment, the [C]ourt may consider the summary judgment motion unopposed, and take as uncontested all evidence presented with that motion."  <u>Perez-Cordero v. Wal-Mart P.R.</u>, 440 F.3d 531, 533-34 (1st Cir. 2006) (internal citation omitted).  "While an unopposed summary judgment still must be scrutinized in accordance with [Rule 56], . . . a party's failure to oppose summary judgment is [usually] fatal to its case."  <u>Id.</u> at 534.

### A.   Uncontested Facts

Zurqui, Inc. is a for-profit corporation that was organized pursuant to the laws of the Commonwealth of Puerto Rico on June 7, 2010.  (Docket No. 76-1.)  Jose Valledor, Ronald Valledor, and Concepcion Valledor Rego are Zurqui, Inc.'s incorporators.  <u>Id.</u> at p. 2.  Jose Valledor, Concepcion Valledor-Rego, Ronald Valledor, and Janice Valledor are Zurqui, Inc.'s equal shareholders and directors.  (Docket No. 76-2 at pp. 4, 9, 10, &

---

[4] The Valledor matrimony moved for partial summary judgment on the same grounds on June 6, 2013.  (Docket No. 50.)  On December 5, 2013, the Court denied the motion as premature because discovery had not yet been completed.  (Docket No. 72.)  In response to that motion, plaintiffs conceded their inability to survive summary judgment on the issue of corporate *alter ego* at that stage of the litigation.  (Docket No. 59.)  Having had an opportunity to plumb the depths of defendant's corporate identity, plaintiffs now fail to respond to defendant's motion.  Nevertheless, for the purposes of deciding this motion, the Court will consider all arguments and exhibits submitted by plaintiffs in opposition to the previous motion.  (Docket Nos. 59 & 60.)

19.)  Zurqui, Inc. adopted its corporate bylaws on June 7, 2010,
(Docket No. 76-3 at pp. 20-25), and kept a record of its corporate
meetings and resolutions (Docket No. 76-2 at pp. 3-19.)  In 2010,
Zurqui, Inc. received an employer identification number (Docket
No. 76-4), filed a corporate income tax return (Docket No. 76-6),
and submitted a corporate annual report to the Puerto Rico
Department of State (Docket No. 76-7).  In 2011, Zurqui, Inc.
registered as a merchant with the Puerto Rico Department of the
Treasury.  (Docket No. 76-8.)  As of March 28, 2011, Zurqui, Inc.
was the registered owner of the Sea Watch.[5]  (Docket No. 76-14.)

B.   **Choice of Law**

In a diversity case, the Court "applies the choice-of-law
rules of the forum state."  Wadsworth, Inc. V. Schwarz-Nin, 951 F.
Supp. 314, 320 (D.P.R. 1996) (Pieras, J.) (citing Klaxon Co. v.
Stentor Elec. Mfg. Co., 313 U.S. 487, 496)(1941)).  This Court has
applied the "most significant contacts" test in tort cases, as well
as in the judicial process of piercing the corporate veil.  See,
e.g., Mercado-Salinas v. Bart Enter. Int'l., Ltd., 800 F. Supp. 2d
354, 359 (D.P.R. 2011) (Gelpi, J.); Goya Foods, Inc. v. Unanue-
Casal, 982 F. Supp. 103, 107 (D.P.R. 1997) (Fuste, J.); Wadsworth,
Inc., 951 F. Supp. 314, 320. Among other contacts, the Court

---

[5] The Court does not consider the purchase and sale agreement
for the Sea Watch submitted as defendant's exhibit 9 (Docket
No. 76-9), because it is signed only by the buyer (defendant) and
not the seller.

Civil No. 12-1585 (FAB)                                         16

considers the corporation's place of incorporation and business, the place where the tortious conduct occurred, and the place where the relationship between the parties existed.  Goya Foods, 982 F. Supp. at 107 (citing Wadsworth, 951 F. Supp. at 321-322).

Here, all of the parties' significant contacts were with Puerto Rico.  Zurqui, Inc. was incorporated and located in Puerto Rico, all interactions between plaintiffs and defendants took place in Puerto Rico, and the tortious conduct occurred in Puerto Rico. Accordingly, the Court applies Puerto Rico law to the veil-piercing analysis.

**C.   Piercing the Corporate Veil - Puerto Rico Law**

Under Puerto Rico law, corporations are presumed to be legal entities separate from their officers, directors, and shareholders.  P.R. Laws Ann. tit. 14 § 3501 *et seq.*; Oficina del Comisionado de Seguros v. Option Health Care Network, Inc., No. AL-2012-59, 2014 WL 1806900, at *12 (P.R. Cir. March 31, 2014); Colon v. Blades, 757 F. Supp. 2d 107, 109 (D.P.R. 2010)(Arenas, J.); Milan v. Centennial Commc'ns. Corp., 500 F. Supp. 2d 14, 26 (D.P.R. 2007) (Gelpi, J.) (citing Fleming v. Toa Alta Dev. Corp., 96 D.P.R. 240, 243 (1968)).  In certain circumstances, the "corporate veil" may be pierced and individual liability imposed upon the individuals for which the corporate entity served merely as an *alter ego*.  Id.  The corporate veil may be pierced pursuant to Puerto Rico law where recognizing the corporate form would

(1) sanction a fraud; (2) promote an injustice; (3) evade statutory obligations; (4) violate public policy; (5) result in inequity; or (6) cover up fraudulent or criminal activity. Oficina el Comisionado de Seguros, 2014 WL 1806900, at *12; Milan, 500 F. Supp. 2d at 26 (internal citations omitted).  This Court has also considered federal common law factors, such as (1) undercapitalization; (2) nonpayment of dividends; (3) failure to observe corporate formalities; (4) absence of corporate records; (5) commingling of funds; and (6) use of corporate funds for non-corporate purposes.  Colon, 757 F. Supp. 2d at 109 (quoting United States v. JG-24, Inc., 331 F. Supp. 2d 14, 63 (D.P.R. 2004) (Acosta, J.)).  The party seeking to pierce the veil has the burden of producing "strong and robust evidence" that the corporate form should be disregarded.  Escude Cruz v. Ortho Pharm. Corp., 619 F. 2d 902, 905 (1st Cir. 1980) (quoting San Miguel Fertilizer Corp. v. P.R. Drydock & Marine Terminals, 94 P.R.R. 403, 409 (1967)).

Defendants contend that because the plaintiffs cannot show a genuine issue of material fact regarding the corporate identity of Zurqui, Inc., summary judgment is warranted in favor of the Valledor matrimony.  In response to an earlier motion for partial summary judgment, plaintiffs pointed to a transcript of a communication between the Coast Guard and Jose Valledor regarding the sinking of the Sea Watch in which Jose Valledor was identified as "the father and co-owner of the vessel Sea Watch."  (Docket

No. 59-1.)  Plaintiffs anchored their claim on this "admission," which they purport establishes that Jose Valledor was the true owner of the Sea Watch.

Drawing all reasonable inferences in plaintiffs' favor, the evidence offered falls short of establishing a genuine issue regarding Zurqui, Inc.'s corporate identity.  Plaintiffs offer no evidence — much less "strong and robust evidence" — suggesting that Zurqui, Inc. is merely Jose Valledor's *alter ego*, while defendants have provided sufficient proof that Zurqui, Inc. observed all relevant corporate formalities.  Though the record contains some evidence that Zurqui, Inc. was extensively controlled by its shareholders (see Docket Nos. 76-1 & 76-2), it is devoid of any indication that recognizing the corporate form would (1) sanction a fraud; (2) promote an injustice; (3) evade statutory obligations; (4) violate public policy; (5) result in inequity; or (6) cover up fraudulent or criminal activity.  See Oficina el Comisionado de Seguros, 2014 WL 1806900, at *12; Milan, 500 F. Supp. 2d at 26).  The record does not permit the Court to disregard Zurqui, Inc.'s corporate form and impose individual liability on Jose Valledor at this stage.  Accordingly, the Valledor matrimony's motion for partial summary judgment is **GRANTED**; all claims against Jose

Valledor, Concepcion Valledor, and their conjugal partnership are
**DISMISSED WITHOUT PREJUDICE**.[6]

## IV. PDMYC's Motion for Partial Summary Judgment

Defendant Palmas del Mar Yacht Club and Marina ("PDMYC") moves
for partial summary judgment.  (Docket No. 81.)  Plaintiffs allege
that defendant PDMYC is jointly and severally liable, along with
the other defendants, because it benefitted from the economic
activity of the Sea Watch, advertised and allowed the vessel to
operate within its premises, and represented to the general public
that the Sea Watch was a seaworthy and safe vessel.  (Docket No. 1
at ¶¶ 23 & 69.)  PDMYC moves for summary judgment, contending that
it neither owed nor breached any duty of care to the passengers of
the Sea Watch.  (Docket Nos. 81 & 84.)

### A. Uncontested Facts[7]

PDMYC is a corporation organized under the laws of Puerto
Rico.  (Docket No. 83-3 at ¶ 2.)  PDMYC's facilities include 158
slips for vessels.  (Docket No. 83-3 at ¶¶ 6-9.)  Though PDMYC has

---

[6] Should this case proceed to trial and result in a verdict
for plaintiffs, the parties may raise the issue of corporate
identity for the purposes of executing a judgment against Zurqui,
Inc.  See P.R. Laws Ann. tit. 14 § 3784; Colon, 757 F. Supp. 2d at
109-10.

[7] The Court notes that while plaintiffs responded to PDMYC's
statement of uncontested material facts (Docket Nos. 83 & 97), they
did not provide any facts of their own or support their denials
with record citations as required by Local Rule 56.  See Loc. R.
56(b)&(c).  As a result, the Court deems unopposed all of PDMYC's
facts that are properly supported.

rented slips in the past to some charter boat operators, PDMYC is
not in the vessel-chartering business and has never been a partner
of the operators or held a proprietary interest in the operators'
businesses.  (Docket Nos. 83-3 at ¶¶ 9 & 19; 83-4 at ¶¶ 1-5.)
PDMYC does not receive commissions or any other type of income from
the charter vessels docked in its facilities.  (Docket Nos. 83-3 at
¶ 17; 83-4 at ¶ 4.)  As of July of 2011, there were two charter
boat operators renting slips in PDMYC's marina:  Sea Watch Divers[8]
and East Puerto Rico Divers.  (Docket No. 83-3 at ¶¶ 9-10.)  PDMYC
entered into a "License Agreement for Dockage" with all slip-rental
customers.  Id. at ¶ 11.  To compensate for the commercial use of
facilities, utilities, and marina resources on a daily basis, PDMYC
charges commercial operators $2.00 more per foot than it charges
non-commercial customers.  Id. at ¶ 12.

     PDMYC had no involvement with the ownership, maintenance,
operation or navigation of the Sea Watch.  (Docket Nos. 83-3 at
¶ 19; 83-4 at ¶¶ 1-3.)  While PDMYC did not actively promote or
advertise Sea Watch Divers or any other charter operator, Sea Watch
Divers and East Puerto Rico Divers requested — and were granted —
permission from PDMYC to put up signs in the marina facilities.
The charter operators did not pay any extra money to display the
signs.  (Docket Nos. 83-3 at ¶ 13; 83-4 at ¶¶ 6-7.)  Sea Watch

---

[8] PDMYC refers to the operators of the Sea Watch as "Sea Watch
Divers;" the Court understands this name to be interchangeable with
defendant Zurqui, Inc.  (See Docket No. 83 at ¶ 18.)

Divers never had an office space at the PDMYC facilities. (Docket Nos. 83-3 at ¶ 14; 83-4 at ¶¶ 8-9.)  If a person called PDMYC seeking information regarding charter boats or trips, PDMYC provided the names and contact numbers of various nearby charter operators, but did not offer specific information, recommendations, or representations regarding particular companies. (Docket Nos. 83-3 at ¶ 6; 83-6; 83-7.)

PDMYC did not collect plaintiffs' payment for the Sea Watch charter trip, and did not receive any commission or income in connection with the trip. (Docket Nos. 83-4 at ¶ 4; 83-9; 83-10.) As of July 24, 2011, PDMYC was not aware of any claim or complaint regarding the services or trips offered by the charter operators in the area, including the Sea Watch. (Docket No. 83-3 at ¶ 18.)  On July 24, 2011, the Sea Watch and its passengers departed from PDMYC's marina facility. (Docket Nos. 83-3 at ¶¶ 10-11; 83-4 at ¶¶ 8-9.)  After the Sea Watch sank, the passengers were rescued and brought back to the PDMYC marina facility. (Docket No. 83 at ¶ 4.)

**B.  Discussion**

Plaintiffs' theory of PDMYC's liability is based on PDMYC's (1) representations to the public regarding the Sea Watch and (2) derivation of economic benefit from the operations of the

Sea Watch.[9]  Plaintiffs do not allege — or offer evidence of —
specific acts of negligence committed by PDMYC, but rather impute
the defendants' negligence to PDMYC as joint a tortfeasor.  (See
Docket No. 1 at ¶¶ 23 & 69.)

        In admiralty, shipowners owe all those lawfully aboard
the vessel "the duty of exercising reasonable care under the
circumstances of each case."  Kermarec, 358 U.S. at 632.  A duty of
care exists when an injury is foreseeable or when contractual or
other relations of the parties impose it.  Daigle v. Point Landing,
Inc., 616 F.2d 825, 827 (5th Cir. 1980).  In determining the
existence of duty, a court must examine and weigh the probability
of an accident, the potential extent of the injury, and the cost of
adequate precautions.  See Complaint of Paducah Towing Co., 692
F.2d 412 (6th Cir. 1982); United States v. Carroll Towing Co., 159
F.2d 169 (2d Cir. 1947).  To sustain a claim for joint venture,
plaintiffs must put forth facts that support some combination of
the following factors:

—————————————

        [9] Plaintiffs' theory of liability is not entirely clear from
their complaint or pleadings.  To the extent that plaintiffs imply
that PDMYC was an agent or broker of the defendants, (see Docket
No. 96 at ¶ 3), this claim fails.  Plaintiffs have not put forth any
evidence that would support an inference of apparent agency.  See
Hung Kang Huang v. Carnival Corp., 909 F. Supp. 2d 1356, 1361 (S.D.
Fla. 2012) ("Under general maritime law, apparent agency may be
established when:  (1) the alleged principal makes some sort of
manifestation causing a third party to believe that the alleged
agent had authority to act for the benefit of the principal,
(2) such belief was [] reasonable, and (3) the claimant reasonably
acted on such belief to his detriment.") (internal citation
omitted).

(1) the intention of the parties to create a joint venture; (2) joint control or right to control; (3) joint proprietary interest in the subject matter of the joint venture; (4) the right of all venturers to share in the profits; and (5) the duty of both to share in the losses.

Hung Kang Huang, 909 F. Supp. 2d at 1361. See also Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria, 935 F.2d 208, 211 (11th Cir. 1991).

Relying on a decision by the District Court for the Eastern District of Louisiana, PDMYC contends that plaintiffs' factual showing falls short of establishing the first element of their negligence claim — duty.  In Travelers Indemnity Co. v. Gulf Weighing Corp., 352 F. Supp. 335 (E.D. La. 1972), a court considered the negligence of a marina that (1) maintained information about the availability of charter boats kept in the marina; (2) received frequent phone calls from potential charter boat customers; (3) informed callers of the charter boat prices; and (4) directed the plaintiff to the defendant charter boat company, but never (5) acted as agent or manager for charter boat owners; (6) entered into any charter agreements; or (7) received any payment from the charter boat owners or captains for these services.  Id. at 343.  After a bench trial, the Louisiana district court found that the marina was "in no way negligent, and did not breach any duty owed to the plaintiffs."  Id.  In support of its verdict, the court noted that the "marina exercised no control over the vessels" in its space, but "merely leased boat slips to various

vessel owners." Id. Accordingly, the court reasoned, "the care and safety of the vessels housed at the marina was left to the individual vessel owners." Id. See also Habans v. Glover, 1992 WL 125372, at * 2-6 (E.D.L.A. 1992) (finding that a marina — from which a chartered boat trip departed and whose employee collected the charter fee — did not owe a single duty to the plaintiffs).

Here, plaintiffs have not put forth sufficient evidence to support an inference that PDMYC and the defendants were, legally, all in the same boat. A factual issue exists as to whether plaintiff Nieto-Vincenty called the marina[10] a few days prior to the trip to inquire about hiring a charter boat to Vieques and was given the names of two charter companies, including Sea Watch Divers. (Docket No. 83-9 at pp. 10-11.) The undisputed facts establish that the Sea Watch was kept at PDMYC's marina facilities, that PDMYC permitted Sea Watch Divers to put up a sign on its property, that PDMYC charged a slightly higher rate for commercial over non-commercial slip leases, and that PDMYC had no knowledge of any claim or complaint regarding Sea Watch Divers' charter trips.

---

[10] Nieto Vincenty's deposition testimony states that he called "the marina at Palmas Del Mar," (Docket No. 83-9 at p. 10), which PDMYC claims is a different marina. (Docket No. 84 at p. 14.) (See also Docket No. 1 at ¶¶ 31-32) (referring to Palmas Del Mar Marina). For the purposes of ruling on this motion, the Court will assume that plaintiffs have alleged that PDMYC was the marina contacted.

Plaintiffs offer nothing to indicate that PDMYC had any further involvement in the July 24, 2011 Sea Watch trip, or any other charter by the Sea Watch.  Thus, drawing all inferences in plaintiffs' favor, the factual record before the Court contains no evidence that PDMYC (1) exercised control over the care or safety of the Sea Watch, (2) made representations about the condition of the Sea Watch or its captain, (3) acted as an agent or broker for Sea Watch Divers, or (4) engaged in a joint venture with Sea Watch Divers.  See Hung Kang Huang, 909 F. Supp. 2d at 1361; Travelers, 352 F. Supp. at 343.

Plaintiffs contend that all of the facts together amount to a "tacit representation of the existence of a relation, of whatsoever nature, between Sea Watch and the marina beyond that of mere boat slip rental, lessor/lessee." (Docket No. 96 at pp. 8-9.) Plaintiffs further argue that the economic benefit PDMYC derived from commercial slip leases indicates a joint venture between PDMYC and Sea Watch Divers.  This argument goes adrift, however, because plaintiffs offer no legal authority to suggest that such minimal involvement by a marina would give rise to a duty of care, constitute a joint venture, or establish a breach of any duty of care owed to passengers on a private charter trip.  The Court agrees with the reasoning of the Travelers court that, given the limited relationship between PDMYC and Sea Watch Divers, "the care and safety of the vessels housed at the marina was left to the

individual vessel owners." <u>Travelers</u>, 352 F. Supp. at 343. Plaintiffs have failed to establish any genuine issue of material fact regarding the existence of a duty owed by PDMYC to plaintiffs, or a breach of any such duty.  Accordingly, the Court must **GRANT** PDMYC's motion for summary judgment.

## V.    Conclusion

For the reasons stated above, the Court **GRANTS** the Valledor matrimony's and PDMYC's motions for summary judgment (Docket Nos. 75 & 81); all claims against PDMYC are **DISMISSED WITH PREJUDICE**; all claims against Jose Valledor, Concepcion Valledor, and their conjugal partnership are **DISMISSED WITHOUT PREJUDICE**. The Court **GRANTS IN PART AND DENIES IN PART** Zurqui, Inc. and the Valledor defendants' motion for summary judgment (Docket No. 80); all claims brought by plaintiff Alicia Vincenty-Medina against all defendants are **DISMISSED WITH PREJUDICE**; all remaining claims against Zurqui, Inc. and the Valledor defendants survive.  The Court **DENIES** Zurqui, Inc. and the Valledor defendants' motion to strike (Docket No. 95).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 30, 2014.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE